ZWEIG VS. HORICON IRON AND MANUFACTURING COMPANY and others.

A company was authorized by its charter to maintain a certain dam across Rock river, provided that in the event of its causing the flowage of lands not belonging to the company, if the latter could not agree with the land owner as to the amount of compensation, such amount should be determined in a mode therein specified. *Held*, that where the owner of lands flowed by the dam had obtained, in accordance with the charter, a judgment for his damages, which was not paid and could not be collected, he was entitled to have the dam abated.

A return by a sheriff to an execution, that after diligent search he could find no property belonging to the defendant whereof to make the whole or any part of the debt, is sufficient evidence of the insolvency of such defendant to authorize the plaintiff to resort to any equitable remedies to which he may be entitled in case of such insolvency.

But if it is shown at the trial of such equitable action, that the defendant in fact has sufficient property subject to sale, upon execution, out of which to satisfy the judgment, and that other parties will be injured by the granting of the relief demanded, the court may properly stay proceedings in such action until a further effort has been made to collect the amount of the plaintiff's judgment upon execution.

Upon payment of such judgment and of the costs of the equitable action, the latter should be dismissed.

APPEAL from the Circuit Court for *Milwaukee* County.

The erection of a dam across Rock river near the village of Horicon, was commenced in 1845, and completed in 1846 or 1847. A saw mill was built in connection with the dam in 1847, and a grist mill in the winter of 1848 and 1849. In

June, 1852, the dam went out; and another was immediately commenced, and was completed in the spring of 1853. On the 15th of March, 1854, " an act to incorporate the Horicon Iron and Manufacturing Company" was approved by the governor; and on the 3d of May following, it was published. The seventh section of that act (chap. 133, Pr. Laws of 1854) is as follows:  " The said company are hereby authorized to maintain the dam now erected across Rock river at the village of Horicon, * * in case the present proprietors shall convey all their right, title and interest in and to the same, and to the parcels of land on which it abuts, to the company hereby incorporated * * :  *Provided*, however, that the dam or dams hereafter constructed shall not be raised so as to flow other lands than are already flowed, or would be flowed on account of said dam at its present height; and in the event of the said dam causing the water to flow upon lands other than those belonging to said company, and if said company cannot agree with the owners thereof as to the amount of compensation to be paid for damages to such lands by reason of such flowing, and for the right to flow the same, then the question of damages to such lands and for such right shall be submitted to arbitrators. [Then follow provisions for such submission, and for a judgment in the circuit court in case of an appeal from the award.] And when the amount so found by said award or judgment shall be paid or tendered to the party entitled thereto, or, if refused by said party, shall be paid into said court for the use of said party, the same shall be a bar to any action or proceeding at law or in equity for such damages."—The dam and water power passed into the hands of the company so organized, during the year 1854, and continued to be maintained thereafter until the commencement of the present action.

In December, 1850, the plaintiff took out a patent from the United States for the S. W. 1-4 of the N. W. 1-4 of S. 10, T. 12, R. 16 in Dodge county, and also for the N. W. 1-4 of the N. E. 1-4 of section 9 in the same town. In November, 1853,

he became owner of the N. E. 1-4 of the S. E. 1-4 of said section 9. In December, 1858, he became owner of the N. W. 1-4 of the S. W. 1-4 of said section 10. The lands were first entered in the summer of 1849. The plaintiff seems to have occupied the two " forties " first mentioned in the summer of 1848. There was evidence at the trial tending to show that no part of the above described lands were flowed until the fall of 1849.—In the fall of 1858, proceedings were taken by the plaintiff to obtain damages from said company for the flowage of his lands, and for the right to flow them; an arbitration was had as provided by the aforesaid charter of the company; an award made in March, 1859, from which the plaintiff appealed; and judgment was rendered for the plaintiff in May, 1860, for $860 damages, with costs. On this judgment execution was issued, May 4, 1860, and on the 4th of July following the sheriff returned that after diligent search he could not find any property belonging to the defendant whereon to make the whole or any part of the amount. No part of the judgment having been paid or tendered to the plaintiff, this action was commenced against the company in 1862, for an abatement of the dam and an injunction against its further maintenance.

The answer of the company denied the regularity of the legal proceedings which resulted in the judgment in the plaintiff's favor for damages; denied that the plaintiff had suffered the damages alleged; insisted on the right of the company to maintain the dam; that by reason of its erection a large and flourishing village, and a large milling and manufacturing interest had grown up, which would be greatly injured by the removal of the dam; that it had been maintained since 1846; that the plaintiff acquired title to his lands in part in 1848 and in part in 1853, and had lived in the neighborhood thereof ever since 1848, and had knowledge of the existence of the dam and the extent of the damage done. The answer also alleged that the execution was improperly returned unsatisfied, and that the company had sufficient property to satisfy the

same, apparent of record.  The court, on motion of the com-
pany, afterwards required the plaintiff to make additional
parties defendants; and the new defendants answered the same
facts which were relied upon by the company, and also that
they were lessees of the company, and had made large im-
provements in mills and machinery, the value of which would
be destroyed if the dam were removed.

The cause was then referred for the taking of the evidence,
and upon the coming in of the referee's report the judge filed
a finding, in which he stated, in substance, that on account of
the length of time which the plaintiff permitted to pass after
the erection of the dam and before the commencement of this
action for damages, during which time a flourishing village had
grown up entirely dependent upon the water power created by
the dam, and mills, manufactories and work shops had been
established, involving much capital, all of which would be
comparatively worthless if the dam was removed, the case, in
his opinion, was clearly within the principles laid down in *Shel-
don v. Rockwell*, 9 Wis., 166; that it was also doubtful whether
the plaintiff had exhausted his legal remedies, since it appear-
ed that the company had property liable to execution; that
the return of the sheriff would indeed be conclusive upon that
point as against the company, but the court would not remove
the dam under such circumstances, when the proceeding would
cause great mischief and oppression to the other defendants;
and that for these reasons the bill must be dismissed.  Judg-
ment accordingly; from which the plaintiff appealed.

*J. M. Gillet*, for appellant:

From the fall of 1849, when a part of the land was flowed,
until the date of the approval of the company's charter, a pe-
riod of four years and a few months, the plaintiff might have
brought his action for damages.  By its charter the defendant
entered into a contract with the state, that it would pay for
such lands as were flowed, the damages to be agreed upon or
ascertained in the manner therein pointed out.  The plaintiff's

previous remedy was taken away, and he was compelled to submit his claims to arbitration. It is from this time, therefore, and not from the time when the plaintiff acquired his title, or from the time when his land was first flowed, that the defendant could set up an estoppel against him. From the organization of the company in the summer of 1854 till some time in 1858, the cases of *Fisher vs. The Horicon Iron & Manufacturing Co.* (10 Wis., 351), and *Thomas vs. The Same*, were pending, to determine whether a suit would not lie at common law, which was the better opinion of the profession at that time. Immediately after those cases were decided, the plaintiff commenced his proceedings by arbitration under the charter. His delay from the organization of the company until that time may well be excused for these reasons. Again, by the charter the company was itself bound to assess and pay damages. So long as this duty devolves on the company, it can never acquire the right to set up an estoppel. It is itself in default, and it is a mere act of grace in the plaintiff not to insist on his remedy. 2. The charter of the company only gives it a conditional right to flow the plaintiff's lands. The condition precedent is, that the plaintiff shall be paid therefor. He has not been paid, although every process known to the law has been resorted to, to obtain payment. Failing and refusing to pay, the company has no right to continue taking private property without compensation. *Ackerman v. The H. I. & M. Co.*, 16 Wis., 150. 3. The other defendants, who are lessees of the company, have no greater rights than their lessor.

*D. J. Pulling*, on the same side, contended, among other things, that the plaintiff was not equitably estopped by his acquiescence. "An equitable estoppel never takes place where one party did not intend to mislead and the other party is not actually misled." 10 N. Y., 419; 5 Seld., 28–35; 3 Hill, 224; Co. Litt., 352, note B. "If the act can be referred to an honest and proper motive, the party will not be concluded, although upon one construction his conduct may be inconsistent with

the right which he afterwards sets up." 9 Barn. & Cress., 577. It was an honest and proper motive on the part of the plaintiff to wait for the adjudication of other actions against the company.

*C. Billinghurst,* for respondents:

The charter being silent as to the manner of enforcing the judgment, it must be enforced like any other judgment. Before the code, it might have been enforced by a creditor's bill; since the code, by supplementary proceedings. Where does the court get any power to abate a dam to satisfy a money judgment? Will the judgment be satisfied if the dam is abated? Could it not be enforced afterwards? Yet it is for future as well as past damages. 2. By the plaintiff's own laches he has lost the right to invoke the equity powers of the court to abate the dam or enjoin the flowing of his land. 3. The evidence shows that the company is possessed of property far in excess of the amount of the plaintiff's judgment. Even a creditor's bill would be dismissed upon a disclosure of this kind, and the creditor would be turned over to his execution.

*Wm. P. Lynde,* on the same side:

The legislature has expressly authorized the company to maintain the dam in question. It has also provided the form of remedy to be pursued in case the land of others is flowed by it. The only judicial remedy of the land owner is the one so prescribed. Angell on Watercourses, sec. 484. The plaintiff has adopted that remedy, and obtained a judgment. When that is paid or collected, the right of the company is absolute forever. Suppose he succeeds in inducing this court to order the dam destroyed, and afterwards collects his judgment (as he can do at any time, as it is apparent from the record that there is an abundance of property to satisfy it): what redress has the company?—This court has decided in *Ackerman v. The H. I. & M. Co.,* 16 Wis., 150, that where an award has been made on which no judgment was entered, and the award was not paid, the court of chancery has a right to abate the dam. The

statute points out no mode of enforcing the award; it cannot be enforced except by suit. But when it is put into judgment, either by appeal or by suit, the claim of the party becomes merged in the judgment; and he has the same redress upon that judgment as he could have upon any other judgment for damages, and no other. He can bring no other action either in law or equity, to recover or be relieved from the damages which are included in that judgment. 2. A plaintiff who has lain by and suffered the defendants to expend large sums upon an undertaking before he applies for an injunction to stop it, will be told that he comes too late. *Corporation of King's Lynn v. Pemberton*, 1 Swanston, 252; *Birmingham Canal Co. v. Lloyd*, 18 Ves., 514; *Sheldon v. Rockwell*, 9 Wis., 166; *Haight v. Proprietors of the Morris Aqueduct*, 4 Wash. C. C., 608; *Lewis v. Chapman*, 3 Bev., 134 (43 Eng. Ch., 133); *Saunders v. Smith*, 3 Mylne & C., 737 (14 Eng. Ch., 728–38); *Harrison v. Newton*, 9 N. Y. Leg. Obs., 347.

*By the Court*, COLE, J. This action is brought for the purpose of removing the dam of the *Horicon Iron and Manufacturing Company*, which overflows the land of the appellant. The company claims the right to maintain the dam by virtue of an act of the legislature of this state. Chap. 133, Pr. Laws of 1854. The appellant, after resorting to the remedy given by the seventh section of the charter,—obtaining judgment and issuing execution thereon, which was returned unsatisfied, —commenced this suit to abate the dam. The circuit judge, considering it doubtful whether the appellant had exhausted his legal remedies, for the reason that it appeared from the evidence given on the trial, that the company had property liable to execution, dismissed the complaint with costs.

The fact that the sheriff had returned the execution with his indorsement thereon, that after diligent search he could find no property belonging the company whereon to make the whole or any part of the writ, was, we think, sufficient evi-

dence of the insolvency of the corporation, and that no satisfaction for damages could be obtained against it by the ordinary processes of the court, and authorized the the appellant to commence this suit. It is true that it likewise appeared upon the trial that there were other defendants, lessees of the company, who were interested in preventing the relief demanded, and who had made valuable improvements at Horicon upon the faith that the dam was legal and could be maintained. This circumstance, although it did not go to the right of the appellant to bring the suit, was nevertheless a proper matter to be considered in determining the question, whether the dam should be at once removed. We therefore think the circuit court, when it appeared that the company had property liable to sale upon execution, might have declined to remove the dam at once, as such a proceeding would cause great mischief to those parties, and stayed proceedings until another and further effort had been made to collect the judgment upon execution. For, while it might well be held, if the company were the only party interested, that the return of the sheriff was conclusive as to its financial condition, yet it does not seem to be going too far, out of regard for the interests of the lessees, for a court of equity to refuse to remove the dam while there was a reasonable prospect that the appellant might obtain satisfaction upon an *alias* execution. Should that effort prove unavailing, then we think there would be presented a clear case of irreparable injury, for the redress of which a court of equity should interfere.

The circuit court seemed to think that this case presented essentially the same questions as those involved in *Sheldon vs. Rockwell*, 9 Wis., 166, and must be ruled by it. In that case the court refused to grant an injunction to restrain the rebuilding of the dam, but upon grounds and for reasons which do not exist here. In that case nineteen years had elapsed between the building of the dam and the commencement of the suit, during which time the injured party had taken no steps:

to enforce his rights by an action at law. In the mean time, the dam had been destroyed several times, and rebuilt, and valuable improvements had been made in connection with the water power. The plaintiff slept upon his rights all this time, not attempting to recover damages resulting from the flowage of his land, either by bringing his action on the case or pursuing his remedy under the mill dam act, which was in force from 1842 to 1849. His first appearance was in a court of equity, asking that the dam should be removed. The land here was overflowed by the company by virtue of its charter. That charter authorized the company to overflow the land of others only upon the condition that it paid such a sum as arbitrators might award or a jury might give for damages caused by its dam. The company refuses to comply with the obligations imposed upon it by the clear language of its chartes. Upon what ground can it insist upon a right or privilege given by an act of the legislature, when it repudiates the conditions upon which the right is granted? Besides, where land is overflowed by virtue of an act of the legislature, the owner is naturally thrown off his guard, and will not enforce his rights with the same promptness which he would under other circumstances. From the fact that the company proceeds to act under its charter, he assumes that it will comply with its provisions in regard to making compensation for damages rendered. In this case the appellant took steps in 1858 or 1859 to have his damages assessed by arbitrators chosen according to section 7 of the charter. He prosecuted his action to final judgment, and sued out his execution. His rights are fully established at law, and, on the return of the execution unsatisfied, he had the right to assume that his remedy was exhausted, so far as obtaining pecuniary compensation for his damages was concerned. What other course remained open to him but to apply to a court of equity to abate the dam, which was a continuing trespass and totally destroyed the use and enjoyment of his property? The company certainly have no right to over-

flow his land, unless they pay the damages caused thereby. In *Hawkins vs. Lawrence*, 8 Blackf., 266, the court say that a company remaining in possession of land after default with respect to the payment for the same as prescribed by the charter, is to be considered as a trespasser *ab initio.* The injury, as already observed, is permanent, and amounts to a total destruction of the estate; and the ordinary legal remedies afford no adequate satisfaction. See *Jerome vs. Ross*, 7 Johns., 314. The appellant has not slept upon his rights, nor been guilty of any undue delay in enforcing them. For these reasons, the principles and doctrine of the case of *Sheldon vs. Rockwell* do not apply. If the company wish to overflow the appellant's land, let it pay the judgment which he has obtained for damages, and thus comply with its charter. And if it neglects to pay, or is insolvent, then surely he has the right to have his property restored to him, so that he can use and enjoy it.

It is suggested that the existence of the dam is a matter of general concern, and that its destruction would materially affect the public, or at least the interests of many persons who have made improvements upon the idea that they could use and enjoy that water power. But we cannot for these reasons disregard the rights of the appellant. Under the circumstances of this case, he is entitled either to have satisfaction of his judgment, or the dam abated. For it is contrary to the first principles of natural justice, as well as the letter and spirit of our constitution, that private property should be taken for public use without compensation. And if the appellant cannot obtain compensation by the ordinary course of law, we think he is entitled to have the dam removed.

For these reasons the judgment of the circuit court is reversed, and the cause remanded with directions to that court to retain the suit until the appellant has made a further effort to collect his judgment by levy and sale of the property of the company upon an execution. Upon the company paying

that judgment and the costs of this suit, it should be dismissed. Otherwise the appellant should have the relief demanded in the complaint.

Judgment reversed, and cause remanded for further proceedings in conformity with this decision.